Ginger E. Jacobs (NY Bar No. 2953347)
JACOBS & SCHLESINGER LLP
1620 Fifth Avenue, Suite 750
San Diego, CA  92101
Tel: (619) 230-0012
Fax: (619) 230-0044
ginger@jsslegal.com

Attorney for Petitioner Al Bazergan

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

Ali Hamed Al Bazergan,

                Petitioner,

v.

Donald J. Trump, in his official capacity as the President of the United States;
U.S. Immigration and Customs Enforcement;
Executive Office of Immigration Review;
CoreCivic, Inc.;
Kristi Noem, Secretary of United States Department of Homeland Security, in her official capacity;
Todd M. Lyons, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity;
John E. Cantu, Field Office Director of U.S. Immigration and Customs Enforcement and Removal Operations (ERO) Phoenix, in his official capacity;
Fred Figueroa, Warden, Eloy Detention Center, in his official capacity;
and
Pamela Bondi, Attorney General of the United States, in her official capacity,

                Respondents.

Case No.:

**PETITIONER ALI HAMED AL BAZERGAN'S MOTION FOR TEMPORARY RESTRAINING ORDER**

**POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

**Agency Doc. No.
A070-637-502**

## NOTICE OF MOTION

Petitioner Ali Hamed AL BAZERGAN ("Petitioner" or "AL BAZERGAN"), by and through his attorney, Ginger E. Jacobs, applies to this honorable Court for a temporary restraining order and preliminary injunction:  (1) enjoining Respondents from continuing to detain him based on their plan to remove him to a third country; (2) ordering his immediate release from immigration detention; (3) enjoining Respondents from re-arresting AL BAZERGAN until he is afforded a hearing before a neutral decisionmaker, as required by the Due Process clause of the Fifth Amendment, to determine whether circumstances have materially changed such that his reincarceration would be justified because there is clear and convincing evidence establishing that he is a danger to the community or a flight risk; and (4) enjoining Respondents from taking Petitioner outside of the United States, which would violate the October 4, 2017 grant of deferral of removal under the Convention Against Torture.

As set forth in the Points and Authorities in support of this Motion, Petitioner raises that he warrants a temporary restraining order due to his weighty liberty interest under the Due Process Clause of the Fifth Amendment in remedying his unlawful re-detention, where that detention appears indefinite and which was imposed absent a pre-deprivation due process hearing.

WHEREFORE, Petitioner prays that this Court grant his request for a temporary restraining order requiring ICE to immediately release him from custody (to enjoin the unlawful ongoing detention), enjoining Respondents from re-detaining him before

providing him a hearing before an Immigration Judge prior to any re-detention, and

enjoining Respondents from removing him to any third country without first providing

him with constitutionally-compliant procedures. The only mechanism to ensure that he is

not continuously unlawfully detained in violation of his due process rights is an ex-parte

temporary restraining order from this Court.

Dated: August 29, 2025                    Respectfully Submitted


                                          By: /s/Ginger E. Jacobs
                                          Ginger E. Jacobs
                                          Attorney for Petitioner
                                          E-mail: ginger@jsslegal.com

## I.  **INTRODUCTION**

Petitioner, Ali Hamed AL BAZERGAN, by and through undersigned counsel, hereby files this motion for a temporary restraining order and preliminary injunction to enjoin the U.S. Department of Homeland Security's ("DHS") Immigration and Customs Enforcement ("ICE") from his ongoing immigration detention in its custody and immediately release him. AL BAZERGAN also seeks an order enjoining Respondents from re-detaining him unless and until he is afforded notice and a hearing before an Immigration Judge prior to any future re-detention where DHS bears the burden of demonstrating that his removal is reasonably foreseeable and otherwise whether circumstances have changed such that his re-detention would be justified (i.e. whether he poses a danger or a flight risk), and where the Immigration Judge must further consider whether, in lieu of detention, alternatives to detention exist to mitigate any risk that DHS may establish. He further seeks an order enjoining Respondents from removing him to any third country without first providing him with constitutionally compliant procedures.

Respondents unlawfully detained AL BAZERGAN on July 23, 2025, at his home. AL BAZERGAN had previously been detained by ICE for two years and twenty-five days from January 12, 2016, to February 5, 2018. On February 5, 2018, ICE released AL BAZERGAN. On October 4, 2018, ICE issued an Order of Release on Supervision. ICE conducted regular check-ins. AL BAZERGAN complied with all conditions of release, and never missed a check-in with ICE.

AL BAZERGAN'S detention is both unconstitutional because it is indefinite, and illegal because it does not comport with the regulations, and he was not otherwise provided any pre-deprivation hearing before his recent detention by ICE. Based on these circumstances, he raises three ways in which his ongoing detention is unlawful and must be enjoined, and requests an injunction against removal to a third country in case that is in the offing:

First, once a noncitizen is released, their re-detention is limited by regulation, statute, and the Constitution. By statute and regulation, only in specific circumstances (that do not apply here) does ICE have the authority to re-detain a noncitizen previously ordered removed. 8 U.S.C. § 1231; 8 C.F.R. § 241.4(*l*)(1)-(2). The ability of ICE to simply re-arrest someone following their release from detention, however, is further limited by the Due Process Clause because it is well-established that individuals released from incarceration have a liberty interest in their freedom. In turn, due process requires that he be released from unlawful re-detention because he was not provided notice and a hearing before an immigration judge (as a neutral adjudicator).

Second, following his release, the same principles must apply, such that in the future he be provided with notice and a hearing prior to any re-detention, at which time DHS bears the burden of justifying his re-detention (to a neutral adjudicator such as an Immigration Judge who is not part of ICE or DHS) and at which AL BAZERGAN will be afforded the opportunity to advance his arguments as to why he should not be re-detained.

Third, the Supreme Court has limited the potentially indefinite post-removal order detention to a maximum of six months when removal is not reasonably foreseeable. *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Because AL BAZERGAN'S removal to Iraq has been deferred under the Convention Against Torture, and because the government has not identified a different third country that will accept AL BAZERGAN, removal is not reasonably foreseeable in this case, and the government has not provided him with notice, evidence, or an opportunity to be heard on this issue before arbitrarily and unilaterally re-detaining him. His continued detention is indefinite and thus unconstitutionally prolonged, and the only remedy is his immediate release.

AL BAZERGAN meets the standard for a temporary restraining order. He will continue to suffer immediate and irreparable harm stemming from his unlawful re-detention absent an order from this Court enjoining the government from further unlawful detention by ordering his release from detention, and enjoining future re-detention unless and until he receives a hearing before an Immigration Judge. He would also suffer immediate and irreparable harm if removed to a third country where his life could be in danger. For that reason, he also seeks an order enjoining Respondents from removing him to any third country without first being provided with constitutionally-compliant procedures providing him adequate notice and an opportunity to demonstrate if his life is in danger or he stands a high risk of torture—all of which are demanded by the Constitution. Because holding federal agencies accountable to constitutional demands is in

the public interest, the balance of equities and public interest are also strongly in AL BAZERGAN'S favor.

## II. <u>STATEMENT OF FACTS AND CASE</u>

AL BAZERGAN is a citizen and national of Iraq who was granted deferral of removal by an Immigration Judge in Eloy, Arizona, on October 4, 2017.

AL BAZERGAN entered the United States on March 10, 1990. After a lengthy procedural history, an Immigration Judge ("IJ") in Tucson, AZ, issued a removal order on April 17, 2013. On January 12, 2016, AL BAZERGAN was detained by DHS at Eloy Detention Center ("EDC"), in Eloy, AZ. On October 4, 2017, an IJ granted AL BAZERGAN'S application for deferral of removal under Article III of the United Nations Convention Against Torture ("CAT"). Respondents appealed the decision of the Immigration Judge to the Board of Immigration Appeals ("BIA"). AL BAZERGAN was released from detention on February 5, 2018, after being detained for two years and twenty-five days. On August 31, 2018, the BIA dismissed Respondents' appeal, and remanded for security checks. On October 3, 2018, the decision became final. Respondents did not pursue further appeal of this decision. To date, Respondents have not taken any steps to reopen or rescind the grant of relief.

On October 4, 2018, DHS initiated an Order of Supervision. AL BAZERGAN has been reporting to ICE on a regular basis since his release from detention more than seven years ago. Since that time, AL BAZERGAN has complied with all conditions of release and has not been convicted of any crimes.

On Wednesday, July 23, 2025, ICE agents went to AL BAZERGAN'S home and detained him. The ICE agents refused to permit him to inform his wife, Saba Mehdi Abu-Tabikh ("Ms. Tabikh"), that he was being detained. His wife was unaware that he had been taken until she received a phone call from him, informing her he had been taken to the Immigration Field Office in Tucson, Arizona. AL BAZERGAN informed his wife that the masked men identified themselves as ICE officers and would not tell him why he was being detained.

That same day, AL BAZERGAN'S Attorney contacted ICE via email and submitted her G-28, notifying them that AL BAZERGAN was granted deferral of removal by an Immigration Judge and cannot be removed to Iraq, and notifying them that AL BAZERGAN has several serious medical issues, including diabetes that is often out of control and results in hospitalization, dementia, and severe chronic pain, and that his dementia means that he cannot understand or sign any papers. AL BAZERGAN'S Attorney also requested that he not be detained under the circumstances.

On Saturday, July 26, 2025, AL BAZERGAN'S Attorney emailed the detention facility and repeated her concerns about his health and asked why he was detained despite his deferral of removal under CAT. On Sunday, July 27, 2025, the detention facility responded, stating that her concerns regarding AL BAZERGAN'S health would be forwarded to their medical department, and that he was being detained for removal to a safe third country. The detention facility also named Officer Yanez as AL BAZERGAN'S Deportation Officer.

MOTION FOR TEMPORARY RESTRAINING ORDER AND POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

8

On Friday, August 1, 2025, AL BAZERGAN'S Attorney spoke with an ICE ERO assistant named Mariah over the phone. Mariah informed AL BAZERGAN'S Attorney that they were looking for a third country to which to deport him, but that they had not found a third country that was willing to take him.

Later that day, AL BAZERGAN'S wife, Ms. Tabikh, informed AL BAZERGAN'S Attorney's office that an ICE Officer had spoken to AL BAZERGAN, and took him to an office where the ICE Officer told AL BAZERGAN that Office Yanez was on vacation, but all of AL BAZERGAN'S previous cases were cancelled, and that his previous immigration status (deferral of removal under the Convention Against Torture) was not valid, and that if he wanted to fight his deportation, he would have to hire an attorney and start over. ICE did not reach out to AL BAZERGAN'S Attorney or office before this meeting, despite being on notice that AL BAZERGAN was represented by Counsel and that his health conditions meant that he cannot understand or sign any paperwork.

On Monday, August 4, 2025, AL BAZERGAN'S Attorney's office emailed ICE describing the conversation that was had with AL BAZERGAN on Friday, reiterating his health conditions and that he cannot understand or sign any paperwork, informed ICE that AL BAZERGAN stated that his medication was being administered differently and that his health was suffering, and requested clarification regarding why AL BAZERGAN was told that he did not have the relief ordered by an immigration judge.

AL BAZERGAN'S Attorney's office then called ICE ERO, which confirmed that Officer Yanez was out on vacation, but should return the following day, and confirmed

receipt of the email, but did not have Ginger Jacobs as the Attorney of Record for AL BAZERGAN.

Officer Apodaca from the detention facility replied to AL BAZERGAN'S Attorney's office's email stating that they could not speak to what was said to AL BAZERGAN regarding the judge's order of deferral, but that "[d]ue to a recent supreme court ruling regarding [deferral of removal under the CAT] and third country removals, we have been advised by OPLA to seek removal of [AL BAZERGAN] to an alternate country. We are in the beginning stages of this process." Officer Apodaca also said that he would request a medical appointment to be conducted to check AL BAZERGAN'S status.

AL BAZERGAN'S Attorney's office replied to Officer Apodaca's email asking for an estimate as to how long the process of seeking removal to a third country would take and asking if Officer Yanez was still AL BAZERGAN'S Deportation Officer.

Officer Apodaca replied that Deportation Officer Yanez was still assigned to the case, and "[a]s far as removal time, there is no estimate to provide. If you would like to speak to your client, and determine a country that would be willing to accept him, that would speed up the process."

In a separate email later that day, Officer Apodaca informed AL BAZERGAN'S Attorney's office that the Attorney "may want to communicate with [AL BAZERGAN] when he is called for medical, he should attend," and that, according to medical staff, AL BAZERGAN did not attend sick calls on July 27, July 29, July 30, and July 31. AL BAZERGAN'S Attorney's office replied and asked for clarification about how he was

called for these appointments and requested that AL BAZERGAN'S wife be allowed to bring his glasses, as he was detained without them. Officer Apodaca replied and notified AL BAZERGAN'S Attorney's office's that the procedure was for AL BAZERGAN to request a "med call" and on the date of the visit, he would be called up and sent to medical, and that it appeared that AL BAZERGAN was called for his visit and did not respond on those dates, and that AL BAZERGAN can request glasses with medical. AL BAZERGAN'S Attorney's office replied and reiterated AL BAZERGAN'S health conditions and asked if there was a way to request the facility assist AL BAZERGAN in responding to the calls for his medical appointments and expressed concern about his health. Officer Apodaca replied that "According to medical he is stable."

On Wednesday, August 6, 2025, Ms. Tabikh notified AL BAZERGAN'S Attorney's office that earlier that morning, two Immigration Officers met with AL BAZERGAN and had him sign a document. They told AL BAZERGAN that it would be shared with his attorney. AL BAZERGAN'S Attorney's office emailed the facility summarizing this information, again expressing that AL BAZERGAN cannot understand and sign any paperwork, asking the facility to forward the documents and provide context about the meeting.

On August 7, 2025, Officer Ernesto Yanez III emailed AL BAZERGAN'S Attorney's office, explaining that AL BAZERGAN was served an I-229 "Notice to Alien of Custody Review" and that he would have a custody review on October 23, 2025, if he was still detained by DHS. Officer Yanez also stated "[i]t also explains on the second page for

'Warning for Failure to Depart' and on the third page explains on 'Instruction Sheet to Detainee Regarding Requirement to Assist in Removal'." Officer Yanez stated "[t]he form was explained to [AL BAZERGAN] and he understood and signed the form." This email contained a copy of the form allegedly served on AL BAZERGAN. Officer Yanez later sent an additional email that same day, stating that a copy of the I-229 was given to AL BAZERGAN.

AL BAZERGAN remains detained at Eloy Detention Center. To date, Respondents have not communicated that they have found a safe third country that would accept AL BAZERGAN. Respondents have not informed AL BAZERGAN, Ms. Tabikh, or AL BAZERGAN'S Attorney of any countries with which they have been in communication regarding their willingness to accept AL BAZERGAN since he was granted deferral of removal under the Convention Against Torture more than seven and a half years ago. In fact, Respondents have asked AL BAZERGAN'S Attorney to determine a country that would be willing to accept him.

## III.   **LEGAL STANDARD**

AL BAZERGAN is entitled to a temporary restraining order if he establishes that he is "likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [his] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that preliminary injunction and temporary restraining order standards are

"substantially identical"). Even if AL BAZERGAN does not show a likelihood of success on the merits, the Court may still grant a temporary restraining order if he raises "serious questions" as to the merits of his claims, the balance of hardships tips "sharply" in his favor, and the remaining equitable factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). As set forth in more detail below, AL BAZERGAN overwhelmingly satisfies both standards

## IV.   <u>ARGUMENT</u>

### A.  **AL BAZERGAN WARRANTS A TEMPORARY RESTRAINING ORDER**

A temporary restraining order should be issued if "immediate and irreparable injury, loss, or irreversible damage will result" to the applicant in the absence of an order. Fed. R. Civ. P. 65(b). The purpose of a temporary restraining order is to prevent irreparable harm before a preliminary injunction hearing is held. *See Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Local No. 70 of Alameda City*, 415 U.S. 423, 439 (1974).

AL BAZERGAN is likely to remain in unlawful custody in violation of his due process rights and is likely to be subject to an illegal removal from the United States without intervention by this Court. AL BAZERGAN will continue to suffer irreparable injury if he continues to be detained without due process and is sent outside of the country, likely to a dangerous place or to Iraq, the country where he fears torture.

### 1.   **Al Bazergan is Likely to Succeed on the Merits of His Claim That ICE has Failed to Follow Its Regulations in Detaining Him.**

AL BAZERGAN is likely to succeed on his claim that, in his particular circumstances, his current detention is unlawful because ICE has failed to follow the regulations that govern revocation of supervised release.

### a.  No Authority to Revoke

The regulations grant ICE the ability to unilaterally revoke any noncitizen's immigration order; however, they also describe a process that has not been followed in AL BAZERGAN'S case. Although ICE has authority to revoke an individual's parole, it does not have the authority, as it has done here, to disregard the regulations and unlawfully detain any individual at any time without regard to that person's rights.

Under 8 C.F.R. 241.4, "Continued detention of inadmissible, criminal, and other aliens beyond the removal period," there are two provisions for revoking release. 8 CFR 241.4(l)(1) describes a process for revocation after an individual violates their release conditions, calling for immediate notification of the reasons for revocation. 8 CFR 241.4(l)(2) describes a process for revocation when the Executive Associate Commissioner of the Service determines to revoke release in the exercise of discretion when it is appropriate to enforce a removal order. 8 CFR 241.4(l)(2)(iii). And when circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner, AND revocation is in the "public interest," a district director may also make the discretionary decision. 8 CFR 241.4(l)(2).

In the Respondent's case, neither the Executive Associate Commissioner of the Service nor a district director made the determination to revoke his release.

### b.  No Change in Circumstances

In *Phan v. Beccerra*, a court in the Eastern District of California facing a similar habeas claim alleging that ICE had failed to properly determine changed circumstances prior to revoking release on supervision, the Court found that release was warranted because "Petitioner has also shown it is likely that there is no change in circumstances such that Petitioner will be removed to Vietnam in the reasonably foreseeable future as required by 241.14(i)(2). *Phan v. Beccerra*, No. 2:25-CV-01757-DC-JDP, 2025 WL 1993735, at *5 (E.D. Cal. July 16, 2025) The Court concluded detention was unlawful "because ICE had not complied with the controlling regulations" for re-detention. *Id*. Because the pre-deprivation *status quo* was for the Petitioner to be out of custody, the Court ordered the Petitioner's release. *Id*. at *6.

Similarly, in *Hoac v. Beccerra*, the District Court first denied a TRO requesting that the Court make an "initial finding of a changed circumstance before Petitioner could be redetained." *Hoac v. Becerra*, No. 2:25-CV-01740-DC-JDP (HC), 2025 WL 1808697, at *4 (E.D. Cal. June 30, 2025). After Petitioners refiled the TRO asserting that the government had failed to follow the procedures for re-detention laid out in 8 C.F.R. 241.13(i)(3), and the Court granted the TRO, finding that the government had failed to demonstrate a material change in circumstances. *Hoac v. Beccerra*, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at *5 (E.D. Cal. July 16, 2025). Specifically, vague assertions regarding Vietnam's future likelihood to accept the Petitioner were insufficient to show that removal was reasonably foreseeable. *Id*.

Similarly, here, ICE's stated reason for the detention—the "recent supreme court [sic] ruling regarding [deferral of removal under the CAT] and third country removals"—and ERO being "advised by OPLA to seek removal of [AL BAZERGAN] to an alternate country" without having identified a country to which to remove him is insufficient to justify AL BAZERGAN'S detention.

### 2. Al Bazergan is Likely to Succeed on the Merits of His Claim That, in Violation of Clear Supreme Court Precedent, his Re-Detention is Unconstitutional Because it is Indefinite.

Second, AL BAZERGAN is likely to succeed on his claim that, in his particular circumstances, the Due Process Clause of the Constitution prevents Respondents from re-detaining AL BAZERGAN because he cannot be deported to any country and his indefinite detention is unconstitutional because there is no end in sight.

Following a final order of removal, ICE is directed by statute to detain an individual for ninety (90) days to effectuate removal. 8 U.S.C. § 1231(a)(2). This ninety (90) day period, also known as "the removal period," generally commences as soon as a removal order becomes administratively final. *Id*. at § 1231(a)(1)(A); § 1231(a)(1)(B).

Here, an IJ granted deferral of removal under CAT on October 4, 2017, which became an administratively final order of removal on October 3, 2018. Due to AL BAZERGAN'S relief under the Convention Against Torture, ICE was unable to remove him to Iraq, and no other country has accepted him.

If ICE fails to remove an individual during the ninety (90) day removal period, the law requires ICE to release the individual under conditions of supervision, including

periodic reporting. 8 U.S.C. § 1231(a)(3) ("If the alien . . . is not removed within the removal period, the alien, pending removal, shall be subject to supervision."). Limited exceptions to this rule exist. Specifically, ICE "may" detain an individual beyond ninety days if the individual was ordered removed on criminal grounds or is determined to pose a danger or flight risk. 8 U.S.C. § 1231(a)(6). However, ICE's authority to detain an individual beyond the removal period under such circumstances is not boundless. Rather, it is constrained by the constitutional requirement that detention "bear a reasonable relationship to the purpose for which the individual [was] committed." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Because the principal purpose of the post-final-order detention statute is to effectuate removal (and not to be punitive), detention bears no reasonable relation to its purpose if removal cannot be effectuated. *Id*. at 697.

The Supreme Court has addressed the fact that the statute is silent regarding the limits on post-final order detention and has definitively held that such detention has the potential to be indefinite and such indefinite detention would be unconstitutional. Thus, there must be constitutional limits on post-final order detention. Specifically, the Supreme Court held that post-final order detention is only authorized for a "period reasonably necessary to secure removal," a period that the Court determined to be presumptively six months. *Id*. at 699-701. After this six-month period, if a detainee provides "good reason" to believe that his or her removal is not significantly likely in the reasonably foreseeable future, "the Government must respond with evidence sufficient to rebut that showing." *Id*. at 701. If the government cannot do so, the individual must be released.

Considering the Supreme Court limitations imposed on the statutory scheme, the government updated the regulations to be consistent with those constitutionally required limitations on indefinite detention. Under those regulations, detainees are entitled to be released even before six months of detention, as long as removal is not reasonably foreseeable. *See* 8 C.F.R. § 241.13(b)(1) (authorizing release after ninety days where removal not reasonably foreseeable). Moreover, under the Supreme Court's constitutional limitations on indefinite detention, as the period of post-final-order detention grows, what counts as "reasonably foreseeable" must conversely shrink. *Zadvydas* at 701.

In this case, AL BAZERGAN was released from ICE detention before the removal period, but after a detention of two years and 25 days. And nothing has changed in the more than seven and a half years since his release. If ICE is permitted to re-detain him now, under the possibility he might be removed some day simply because he has a removal order, then he very likely will be detained in ICE custody without limit.

Here, AL BAZERGAN'S detention is unconstitutional because it is indefinite. AL BAZERGAN has been granted deferral of removal under the Convention Against Torture and ICE has made no effort to reopen his case to deport him to Iraq, his only country of citizenship. Removal is not reasonably foreseeable in this case, and the government has not provided AL BAZERGAN with notice, evidence, or an opportunity to be heard on this issue before arbitrarily re-detaining him. His continued detention without any reasonably foreseeable end point is thus unconstitutionally prolonged in violation of clear Supreme Court precedent. *Id*. Moreover, AL BAZERGAN already served 756 days in ICE detention

before he was released in 2018, and therefore he may—and under these circumstances, must—be released. 8 C.F.R. § 241.13(b)(1); *see also Tadros v. Noem*, No. 2:25-cv-04108-EP (D.N.J. June 17, 2025)

> **3.** **Al Bazergan is Likely to Succeed on the Merits of His Claim That Due Process Requires That He Should Have Been Afforded a Hearing Before an Immigration Judge Prior to Any Re-Detention by ICE, and He is Entitled to Such a Hearing Prior to Any Future Re-Detention.**

AL BAZERGAN is also likely to succeed on his claim that fundamental principles of due process require that he cannot be re-detained by ICE without first being provided a pre-deprivation hearing before an Immigration Judge where the government shows that his removal is reasonably foreseeable and that circumstances have changed since his release in 2018, including that AL BAZERGAN is now a danger or a flight risk.

ICE's regulatory authority to unilaterally re-detain AL BAZERGAN is proscribed by the Due Process Clause because it is well-established that individuals released from incarceration have a liberty interest in their freedom. *See e.g., Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017) ("a person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process before he is re-incarcerated"). In turn, to protect that interest, on the particular facts of AL BAZERGAN'S case, due process required notice and a hearing prior to any re-arrest, at which he should have been afforded the opportunity to advance his arguments as to why he should not be re-detained. This never occurred. *Rodriguez Diaz v. Kaiser, et al.*, 3:25-cv-05071 (N.D. Cal. June 14, 2025) (TRO prohibiting the

government from re-detaining the petitioner without notice and a hearing before a neutral adjudicator); *T.P.S. v. Kaiser, et al.*, 3:25-cv-05428 (N.D. Cal. June 30, 2025) (same).

Courts analyze these procedural due process claims in two steps: (1) whether there exists a protected liberty interest, and (2) the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution. *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989).

### a. Al Bazergan Has a Protected Liberty Interest in His Release

AL BAZERGAN'S liberty from immigration custody is protected by the Due Process Clause: "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Since February 2018, AL BAZERGAN exercised that freedom after being granted release from ICE custody. Although he was released under the condition that he is under supervision and reports to ICE regularly (and thus under government custody), he retains a weighty liberty interest under the Due Process Clause of the Fifth Amendment in avoiding unlawful re-detention. *See Young v. Harper*, 520 U.S. 143, 146-47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482-483 (1972).

In *Morrissey*, the Supreme Court examined the "nature of the interest" that a parolee has in "his continued liberty." 408 U.S. at 481-82. The Court noted that, "subject to the conditions of his parole, [a parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id*. at 482. The

Court further noted that "the parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id*. The Court explained that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often others." *Id*. In turn, "[b]y whatever name, the liberty is valuable and must be seen within the protection of the [Fifth] Amendment." *Morrissey*, 408 U.S. at 482.

This basic principle—that individuals have a liberty interest in their conditional release—has been reinforced by both the Supreme Court and the circuit courts on numerous occasions. *See, e.g., Young v. Harper*, 520 U.S. at 152 (holding that individuals placed in a pre-parole program created to reduce prison overcrowding have a protected liberty interest requiring pre-deprivation process); *Gagnon v. Scarpelli*, 411 U.S. at 781- 82 (holding that individuals released on felony probation have a protected liberty interest requiring pre-deprivation process). As the First Circuit has explained when analyzing the issue of whether a specific conditional release rises to the level of a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted). *See also, e.g., Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017) ("a person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process

before he is re-incarcerated") (*citing Young*, 520 U.S. at 152, *Gagnon*, 411 U.S. at 782, and *Morrissey*, 408 U.S. at 482).

In fact, it is well-established that an individual maintains a protectable liberty interest even where the individual obtains liberty through a mistake of law or fact. *See id.*; *Gonzalez-Fuentes*, 607 F.3d at 887; *Johnson v. Williford*, 682 F.2d 868, 873 (9th Cir. 1982) (noting that due process considerations support the notion that an inmate released on parole by mistake, because he was serving a sentence that did not carry a possibility of parole, could not be re-incarcerated because the mistaken release was not his fault, and he had appropriately adjusted to society, so it "would be inconsistent with fundamental principles of liberty and justice" to return him to prison) (internal quotation marks and citation omitted).

Here, when this Court compar[es] the specific conditional release in [AL BAZERGAN'S case], with the liberty interest in parole as characterized by *Morrissey*, they are strikingly similar. *See Gonzalez-Fuentes*, 607 F.3d at 887. Just as in *Morrissey*, AL BAZERGAN'S release "enables him to do a wide range of things open to persons" who have never been in custody or convicted of any crime, including to live at home, work, care for his children, and "be with family and friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482.

AL BAZERGAN has complied with all conditions of release for over seven and a half years, after winning his case before the Immigration Judge based on the risk of torture he would face if returned to Iraq.

### b. Al Bazergan's Liberty Interest Mandates His Release from Unlawful Custody and A Hearing Before any Re-Arrest

AL BAZERGAN asserts that, here, (1) where his detention would be civil; (2) where he has been at liberty for over seven and a half years, during which time he has complied with all conditions of release; (3) where no change in circumstances exist that would justify his lawful detention; and (4) where the only circumstance that has changed is ICE's new policy to arrest as many people as possible because of the new administration, due process mandates that he be released from unlawful custody and receive notice and a hearing before a neutral adjudicator prior to any re-arrest or revocation of his custody release.

"Adequate, or due, process depends upon the nature of the interest affected. The more important the interest and the greater the effect of its impairment, the greater the procedural safeguards the [government] must provide to satisfy due process." *Haygood v. Younger*, 769 F.2d 1350, 1355-56 (9th Cir. 1985) (*en banc*) (citing *Morrissey*, 408 U.S. at 481-82). This Court must "balance [AL BAZERGAN'S] liberty interest against the [government's] interest in the efficient administration of" its immigration laws to determine what process he is owed to ensure that ICE does not unconstitutionally deprive him of his liberty. *Id*. at 1357. Under the test set forth in *Mathews v. Eldridge*, this Court must consider three factors in conducting its balancing test: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

procedural requirements would entail." *Haygood*, 769 F.2d at 1357 (*citing Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). Only in a "special case" where post-deprivation remedies are "the only remedies the State could be expected to provide" can post-deprivation process satisfy the requirements of due process. *Zinermon*, 494 U.S. at 985. Moreover, only where "one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue" such that "the State cannot be required constitutionally to do the impossible by providing predeprivation process," can the government avoid providing pre-deprivation process. *Id*.

Because, in this case, the provision of a pre-deprivation hearing is both possible and valuable to prevent an erroneous deprivation of liberty, ICE is required to provide AL BAZERGAN with notice and a hearing prior to any re-incarceration and revocation of his Order of Supervision. *See Morrissey*, 408 U.S. at 481-82; Haygood, 769 F.2d at 1355-56; *Jones*, 393 F.3d at 932; *Zinermon*, 494 U.S. at 985; *see also Youngberg v. Romeo*, 457 U.S. 307, 321-24 (1982); *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) (holding that individuals awaiting involuntary civil commitment proceedings may not constitutionally be held in jail pending the determination as to whether they can ultimately be recommitted). Under *Mathews*, "the balance weighs heavily in favor of [AL BAZERGAN'S] liberty" and requires a pre-deprivation hearing before a neutral adjudicator.

### i. Al Bazergan's Private Interest in His Liberty is Profound

Under *Morrissey* and its progeny, individuals conditionally released from serving a criminal sentence have a liberty interest that is "valuable." *Morrissey*, 408 U.S. at 482. In addition, the principles espoused in *Hurd* and *Johnson*—that a person who is in fact free of physical confinement, even if that freedom is lawfully revocable, has a liberty interest that entitles him to constitutional due process before he is re-incarcerated—apply with even greater force to individuals like AL BAZERGAN, who have been released pending civil removal proceedings, rather than parolees or probationers who are subject to incarceration as part of a sentence for a criminal conviction. Parolees and probationers have a diminished liberty interest given their underlying convictions. *See, e.g., U.S. v. Knights*, 534 U.S. 112, 119 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987). Nonetheless, even in the criminal parolee context, the courts have held that the parolee cannot be re-arrested without a due process hearing in which they can raise any claims they may have regarding why their re-incarceration would be unlawful. *See Gonzalez-Fuentes*, 607 F.3d at 891-92; *Hurd*, 864 F.3d at 683. Thus, AL BAZERGAN retains a truly weighty liberty interest even though he is under conditional release.

What is at stake in this case for AL BAZERGAN is one of the most profound individual interests recognized by our legal system: whether ICE may unilaterally nullify a prior decision releasing a non-citizen from custody and be able to take away his physical freedom, i.e., his "constitutionally protected interest in avoiding physical restraint." *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (internal quotation omitted). "Freedom

MOTION FOR TEMPORARY RESTRAINING ORDER AND POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

25

from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). *See also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."); *Cooper v. Oklahoma*, 517 U.S. 348 (1996). Thus, there is a profound private interest at stake in this case, which must be weighed heavily when determining what process he is owed under the Constitution. *See Mathews*, 424 U.S. at 334-35.

### ii. The Government's Interest in Re-detaining Al Bazergan Without a Hearing is Low and the Burden on the Government to Refrain from Re-Arresting Him Unless and Until He is Provided a Hearing is Minimal

The government's interest in maintaining an unlawful detention without a due process hearing is low, and when weighed against AL BAZERGAN'S significant private interest in his liberty, the scale tips sharply in favor of enjoining Respondents (1) from keeping him in unlawful custody; (2) re-arresting AL BAZERGAN unless and until the government demonstrates to a neutral adjudicator by clear and convincing evidence that he is a flight risk or danger to the community; and (3) removing him from the United States in violation of an agency order. It becomes abundantly clear that the *Mathews* test favors AL BAZERGAN when the Court considers that the process he seeks—notice and a hearing regarding whether release from custody should be revoked— is a standard course of action for the government. Providing AL BAZERGAN with a hearing before this Court (or a neutral decisionmaker) to determine whether there is clear and convincing evidence that AL BAZERGAN is a flight risk or danger to the community would impose only a *de*

*minimis* burden on the government, because the government routinely provides this sort of hearing to individuals like AL BAZERGAN.

Because immigration detention is civil, it can have no punitive purpose. The ICE officer's explanation for re-arresting AL BAZERGAN indicates no purpose at all, other than to wait for the possibility that another country may change its mind and agree to accept him. The government's only lawful interest in holding an individual in immigration detention can be to prevent danger to the community or to ensure a noncitizen's compliance with the removal process. *See Zadvydas*, 533 U.S. at 690. In this case, the government cannot plausibly assert that it has any basis for detaining AL BAZERGAN in July 2025 when he had lived at liberty complying with the conditions of his release for seven and a half years after his release, thriving and contributing to his local community.

On February 5, 2018, AL BAZERGAN was not a danger to the community such that he must remain detained. His circumstances have not changed. *See Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 U.S. Dist. LEXIS 156344, at *41 (D. Ariz. Aug. 11, 2025) ("The government has not identified any new information specific to Rosado's circumstances to undermine its own prior determination that she does not pose a danger or a flight risk if allowed to remain at large in the population during her removal proceedings."); *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017) ("Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk."). *See Morrissey*, 408 U.S. at 482 ("'It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional

freedom so long as he abides by the conditions on his release, than to his mere anticipation or hope of freedom'") (*quoting United States ex rel. Bey v. Connecticut Board of Parole*, 443 F.3d 1079, 1086 (2d Cir. 1971)).

As to flight risk, since his release from custody in February 2018, ICE has required regular check-ins. Those conditions have proven sufficient to guard against any possible flight risk, and to "assure [his] presence at the moment of removal." *Zadvydas*, 533 U.S. at 699. It is difficult to see how the government's interest in ensuring AL BAZERGAN's presence at the moment of removal has materially changed since he was released in February 2018, when he has complied with all conditions of release. The government's interest in detaining AL BAZERGAN currently is therefore low. That ICE has a new policy to make a minimum number of arrests each day under the new administration does not constitute a material change to AL BAZERGAN's circumstances,[1] nor does the policy directive regarding third country removals present sufficient likelihood of removal such that the government has established circumstances have changed in AL BAZERGAN'S case.

---

[1] *See* "Trump officials issue quotas to ICE officers to ramp up arrests," *Washington Post* (January 26, 2025), available at: https://www.washingtonpost.com/immigration/2025/01/26/icearrests-raids-trump-quota/.; "Stephen Miller's Order Likely Sparked Immigration Arrests And Protests," Forbes (June 9, 2025), https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order-likely-sparkedimmigration-arrests-and-protests/ ("At the end of May 2025, 'Stephen Miller, a senior White House official, told Fox News that the White House was looking for ICE to arrest 3,000 people a day, a major increase in enforcement. The agency had arrested more than 66,000 people in the first 100 days of the Trump administration, an average of about 660 arrests a day,' reported the New York Times. Arresting 3,000 people daily would surpass 1 million arrests in a calendar year.").

Moreover, the "fiscal and administrative burdens" that his immediate release and a lawful pre-detention hearing would impose is nonexistent in this case. *See Mathews*, 424 U.S. at 334-35. AL BAZERGAN does not seek a unique or expensive form of process, but rather a routine hearing to determine whether he should be re-detained.

As the Ninth Circuit noted in 2017, which remains true today, "[t]he costs to the public of immigration detention are 'staggering': $158 each day per detainee, amounting to a total daily cost of $6.5 million." *Hernandez*, 872 F.3d at 996. AL BAZERGAN has an order of deferral of removal under the Convention Against Torture, which the government has made no effort to reopen. ICE's unlawful action of placing him in custody is more of a financial burden than releasing him and providing any pre-custody hearing before any future re-arrest occurs.

In the alternative, providing AL BAZERGAN with a hearing before this Court (or a neutral decisionmaker) regarding release from custody is a routine procedure that the government provides to those in immigration jails on a daily basis. At that hearing, the Court would have the opportunity to determine whether circumstances have changed sufficiently to justify his re-arrest. But there is no justifiable reason to re-incarcerate AL BAZERGAN prior to such a hearing taking place. As the Supreme Court noted in *Morrissey*, even where the State has an "overwhelming interest in being able to return [a parolee] to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole . . . the State has no interest in revoking parole without some informal procedural guarantees." 408 U.S. at 483.

Releasing AL BAZERGAN from unlawful custody and enjoining AL BAZERGAN'S rearrest until ICE (1) moves for a bond re-determination before an IJ and (2) demonstrates by clear and convincing evidence that AL BAZERGAN is a flight risk or danger to the community is far *less* costly and burdensome for the government than keeping him detained. *Hernandez*, 872 F.3d at 996.

> ### iii. Without a Due Process Hearing Prior to Any Re-Arrest, the Risk of an Erroneous Deprivation of Liberty is High, and Process in the Form of a Constitutionally Compliant Hearing Where ICE Carries the Burden Would Decrease That Risk

Releasing AL BAZERGAN from unlawful custody and providing him with a pre-deprivation hearing would decrease the risk of him being erroneously deprived of his liberty. Before AL BAZERGAN can be lawfully re-detained, he must be provided with a hearing before a neutral adjudicator at which the government is held to show that there has been sufficiently changed circumstances such that ICE's January 2018 release from custody determination should be altered or revoked because clear and convincing evidence exists to establish that AL BAZERGAN is a danger to the community or a flight risk. *See Rosado v. Figueroa,* No. CV 25-02157 PHX DLR (CDB), 2025 U.S. Dist. LEXIS 156344, at *40 (D. Ariz. Aug. 11, 2025) ("The Ninth Circuit has held that when there is a substantial liberty interest at stake, the government should have the burden of proving, by clear and convincing evidence, that an individual is a danger or flight risk before depriving the individual of their liberty") (citing *Singh*, 638 F.3d at 1203-04 (9th Cir. 2011).

On July 23, 2025, AL BAZERGAN did not receive this protection. Instead, masked ICE officers took him into custody outside his home without even providing a reason, or allowing him to notify his wife, who was inside the house, before taking him away.

By contrast, the procedure AL BAZERGAN seeks—a hearing in front of a neutral adjudicator at which the government must prove by clear and convincing evidence that circumstances have changed to justify his detention *before* any re-arrest—is much more likely to produce accurate determinations regarding factual disputes, such as whether a certain occurrence constitutes a "changed circumstance." *See Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1381 (9th Cir. 1989) (when "delicate judgments depending on credibility of witnesses and assessment of conditions not subject to measurement" are at issue, the "risk of error is considerable when just determinations are made after hearing only one side"). "A neutral judge is one of the most basic due process protections." *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001), *abrogated on other grounds by Fernandez Vargas v. Gonzales*, 548 U.S. 30 (2006). The Ninth Circuit has noted that the risk of an erroneous deprivation of liberty under Mathews can be decreased where a neutral decisionmaker, rather than ICE alone, makes custody determinations. *Diouf v. Napolitano* ("*Diouf II*"), 634 F.3d 1081, 1091-92 (9th Cir. 2011).

Due process also requires consideration of alternatives to detention at any custody redetermination hearing that may occur. The primary purpose of immigration detention is to ensure a noncitizen's appearance during removal proceedings. *Zadvydas*, 533 U.S. at 697. Detention is not reasonably related to this purpose if there are alternatives to detention

that could mitigate risk of flight. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979). Accordingly, alternatives to detention must be considered in determining whether AL BAZERGAN'S re-incarceration is warranted.

As the above-cited authorities show, AL BAZERGAN is likely to succeed on his claim that the current arrest and detention that ICE effectuated on July 23, 2025, is unlawful. The Due Process Clause requires notice and a hearing before a neutral decisionmaker *prior* to any re-incarceration by ICE. And, at the very minimum, he clearly raises serious questions regarding this issue, thus also meriting a TRO. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

### B. Al Bazergan Will Suffer Irreparable Harm Absent Injunctive Relief

AL BAZERGAN will suffer irreparable harm if he remains detained after being deprived of his liberty and subjected to unlawful detention by immigration authorities without being provided with the constitutionally adequate process that this motion for a temporary restraining order seeks.

Detainees in ICE custody are held in "prison-like conditions." *Preap v. Johnson*, 831 F.3d 1193, 1195 (9th Cir. 2016). As the Supreme Court has explained, "[t]he time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness." *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972); *accord Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*, 743 F.2d 1365, 1369 (9th Cir. 1984). Moreover, the Ninth Circuit has recognized in "concrete terms the irreparable harms imposed on anyone subject to immigration detention" including "subpar medical

and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez*, 872 F.3d at 995. The government itself has documented alarmingly poor conditions in ICE detention centers. *See, e.g.*, DHS, Office of Inspector General (OIG), Summary of Unannounced Inspections of ICE Facilities Conducted in Fiscal Years 2020- 2023 (2024) (reporting violations of environmental health and safety standards; staffing shortages affecting the level of care detainees received for suicide watch, and detainees being held in administrative segregation in unauthorized restraints, without being allowed time outside their cell, and with no documentation that they were provided health care or three meals a day).[2]

Lastly, while being held in immigration detention, AL BAZERGAN is at risk of being illegally returned to Iraq where he faces a likelihood of torture.

AL BAZERGAN suffers from multiple severe illnesses that required hospitalization before he was detained, including uncontrolled diabetes, and severe chronic pain. He asserts that these illnesses are not being properly managed in detention. He asserts that he is not regularly receiving his medication as scheduled and prescribed, and that he is in severe pain. Additionally, he has worn prescription eyeglasses since he was a child, and because he was not wearing them when ICE officers arrived at his home and arrested him,

---

[2] Available at https://www.oig.dhs.gov/sites/default/files/assets/2024-09/OIG-24-59- Sep24.pdf (last accessed Feb. 6, 2024).

MOTION FOR TEMPORARY RESTRAINING ORDER AND POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

33

he has not had his glasses in detention. His health and well-being are suffering with each day he is detained.

AL BAZERGAN and his wife entered the United States in March 1990—thirty-five and a half years ago. Their entire family is here in the United States. During that time, he has worked hard to establish a stable life for himself and his family. He has worked, supported his community, and spent time with his immediate and extended family. Detention would irreparably harm not only AL BAZERGAN, but also his U.S. citizen family and friends.

As detailed *supra*, AL BAZERGAN contends that his re-arrest absent a hearing before a neutral adjudicator would violate his due process rights under the Constitution. It is clear that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, a temporary restraining order is necessary to prevent AL BAZERGAN from suffering irreparable harm by being subject to unlawful and unjust detention.

### C. The Balance of Equities and the Public Interest Favor Granting the Temporary Restraining Order

The balance of equities and the public interest undoubtedly favor granting this temporary restraining order.

First, the balance of hardships strongly favors AL BAZERGAN. The government cannot suffer harm from an injunction that prevents it from engaging in an unlawful practice. *See Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot

reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."). Therefore, the government cannot allege harm arising from a temporary restraining order or preliminary injunction ordering it to comply with the Constitution.

Further, any burden imposed by requiring the DHS to release AL BAZERGAN from unlawful custody and refrain from re-arrest unless and until he is provided a hearing before a neutral arbiter is both *de minimis* and clearly outweighed by the substantial harm he will suffer as if he is detained. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required.").

Finally, a temporary restraining order is in the public interest. First and most importantly, "it would not be equitable or in the public's interest to allow [a party] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (*quoting Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). If a temporary restraining order is not entered, the government would effectively be granted permission to detain AL BAZERGAN in violation of the requirements of Due Process. "The public interest and the balance of the equities favor 'prevent[ing] the violation of a party's constitutional rights.'" *Ariz. Dream Act Coal.*, 757 F.3d at 1069 (*quoting Melendres*, 695 F.3d at 1002); *see also Hernandez*, 872 F.3d at 996 ("The public interest benefits from an injunction that ensures that individuals are not deprived of their liberty and held in

immigration detention because of bonds established by a likely unconstitutional process."); *cf. Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.") Therefore, the public interest overwhelmingly favors entering a temporary restraining order and preliminary injunction.

## V.   **CONCLUSION**

For all the above reasons, this Court should find that AL BAZERGAN warrants a temporary restraining order and a preliminary injunction ordering that Respondents (1) release him from his unlawful custody; (2) refrain from re-arresting him unless and until he is afforded a hearing before a neutral adjudicator on whether a change in custody is justified by clear and convincing evidence that re-detention is not indefinite and further whether he is a danger to the community or a flight risk; and (3) not remove him to any third country without first providing him with constitutionally-compliant procedures.

Dated: August 29, 2025                    Respectfully submitted,

By: /s/Ginger E. Jacobs
Ginger E. Jacobs
Attorney for Petitioner
E-mail: ginger@jsslegal.com

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Ali Hamed Al Bazergan, <br><br> Petitioner, <br><br> v. <br><br> Donald J. Trump, in his official capacity as the President of the United States, *et al.,* <br><br> Respondents. | Case No.: <br><br> **[PROPOSED] TEMPORARY RESTRAINING ORDER** <br><br> **Agency Doc. No. A070-637-502** |

### [PROPOSED] TEMPORARY RESTRAINING ORDER

**PROPOSED ORDER**

Petitioner's Motion for Temporary Restraining Order is hereby Granted/Denied.

a.  The Respondents are enjoined from continuing to detain him based on his imminent removal to a third country

b.  The Respondents are ordered to immediately release Petitioner from immigration detention

c.  The Respondents are enjoined from re-arresting Petitioner until he is afforded a hearing before a neutral decisionmaker, as required by the Due Process clause of the Fifth Amendment, to determine whether circumstances have materially changed such that his reincarceration would be justified because there is clear and convincing evidence establishing that he is a danger to the community or a flight risk

d.  The Respondents are enjoined from taking Petitioner outside of the United States, which would violate the October 4, 2017 grant of deferral of removal under the Convention Against Torture.